1

2

3

4

5

6

7

8

9                     UNITED STATES DISTRICT COURT

10                     EASTERN DISTRICT OF CALIFORNIA

11

12   UNITED STATES OF AMERICA,          No. 2:15-CR-236-GEB

13              Plaintiff,

14        v.                            **ORDER GRANTING THE GOVERNMENT'S**
                                        **MOTION FOR REVOCATION OF THE**
15   NELLI KESOYAN,                     **MAGISTRATE JUDGE'S RELEASE ORDER**

16              Defendant.

17

18            The United States of America (the "Government") moves,

19   ECF No. 198, for revocation of the Magistrate Judge's order

20   releasing defendant Nelli Kesoyan ("Defendant") on a secured bond

21   pending sentencing, ECF No. 196, arguing "Kesoyan has failed to

22   meet her burden to show by clear and convincing evidence that she

23   is not a flight risk or danger to any person."  Gov't Mem. of

24   P. & A. in Supp. of Mot. to Revoke ("Gov't Mem.") 4:5-7, ECF

25   No. 201.  Defendant opposes the motion arguing, the Magistrate

26   Judge's "decision was sound, fully supported by a clear record,

27   and should not be disturbed because Mrs. Kesoyan demonstrated by

28   clear and convincing evidence that she is not likely to flee or

                                   1

pose any danger if released on the ordered bond and the stringent conditions." Def. Opp'n to Mot. ("Def. Opp'n") 2:19-23, ECF No. 203.

Defendant was remanded to custody after the jury returned a guilty verdict on January 31, 2018. The Government then argued under 18 U.S.C. § 3143, that Defendant should be remanded pending sentence because she could not sustain her burden of proving by clear and convincing evidence that "she's not a risk of flight or a danger." Tr. of Trial, Jan. 31, 2018, 4:24-5:1, ECF No. 191. The Government argued:

> [T]he burden is now on the defendant. And she's now convicted of crimes including conspiring to lie to a federal agency and to obstruct, influence, or impede that agency's proceedings including by telling lies in person while under oath and sworn, submitting false documents, including documents that she created while a social security employee on official Social Security letterhead, and inducing another individual, Ra[z]mik Bagdasaryan, to sign an affidavit that was sworn before a notary and then submitted to those agency proceedings. And the court has heard the testimony over the last couple of weeks in that regard.

> The Government is also concerned that the defendant has provided perjured testimony on the stand during the proceedings in the trial, and that the assurances the defendant might make as to making appearances or not obstructing or interfering with other individuals including -- well, other individuals, should not be credited.

> In this case, there was a no contact order for the defendant not to contact Ra[z]mik Bagdasaryan. That the Government would proffer that the defendant's husband proceeded to contact that witness during the course of the proceedings and ultimately, as laid out in the Government's motion to admit the statements of Ra[z]mik Bagdasaryan, which was filed January 13th of 2018, document number 141, which the Government ultimately

withdrew, but that laid out a basis for why the Government believed that the defendant was responsible or acquiesce in the causing of the absence of Ra[z]mik Bagdasaryan, who is now believed to be in Armenia on a one-way ticket from the United States and did not return for trial.

So the Government has an ongoing concern that a witness has already disappeared in this case. So obstruction provides another area of concern for the Government.

At bottom, Your Honor, the Government's concerned that the defendant has no respect for federal agencies, or even the proceedings here, and would not stop short of fleeing or otherwise engaging in misconduct.

And for those reasons, the Government would move to remand the defendant pending sentencing.

Id. at 5:4-16.

Defendant rejoined, arguing in essence: "There is nothing indicating that Ms. Kesoyan would not have respect for these proceedings, has not respected this court and its orders . . . . She has no criminal history. She has no ties outside of the Sacramento community were she to flee. She's not a flight risk."  Id. at 7:13-24.  The district judge made the conclusory ruling: "I disagree. I think the Government's correct. She's remanded pending sentencing."  Id. at 8:3-4.  Defendant subsequently filed a motion for conditions of release to be heard by the duty Magistrate Judge, Def. Mot. for Bail Rev. Pending Sent'g, ECF No. 194, and the Government filed an opposition, Gov't Opp'n to Mot. for Bail Rev. Pending Sent'g, ECF No. 195.

The Magistrate Judge held a bail review hearing on February 28, 2018, and ultimately "order[ed] Ms. Kesoyan released pursuant to the $1.5 million property bond . . . and on

conditions . . . , and . . . order[ed the] release [of Defendant be] stayed . . . for 10 days to permit the government appeal . . . ." Tr. of Bail Rev. Hr'g, Feb. 28, 2018, 37:14-19, ECF No. 202. The Magistrate Judge found as follows:

> I am well aware that the defendant has been convicted and that pending sentencing . . . there's no longer a presumption for release, there's a presumption for detention and she has to overcome the flight risk presumption by clear and convincing evidence or a proffer that clearly and convincingly demonstrate that conditions will prevent flight.
>
> . . . .
>
> [T]he only question is whether she is likely to skip town prior to sentencing. I understand all the reasons that [the Government does not] think she's a trustworthy individual.
>
> [The Government has] raised serious issues about her honesty and her character, and I understand [the Government's] relevance argument to flight risk, but . . . also, in my experience, lots of criminal defendants and offenders who commit fraud offenses and have a constitutional inability to tell the truth, nonetheless show up for court[;] there isn't a necessary correlation there and I think that a bond secured by $1.5 million in equity and ankle monitoring and the curfew are going to get her to show up for sentencing, and that's really the only question in front of me.
>
> I'm concerned about these other issues as well. I'm aware that I'm imposing what might be problematic supervision on Pretrial Services, but the legal question that I have to ask is whether the conditions that the defense is offering are going to be sufficient to ensure her appearance at court by a clear and convincing evidence standard and I think that has been met.

Tr. of Bail Rev. Hr'g, 34:23-35:24.

The Government seeks review of the Magistrate Judge's release decision. Under 18 U.S.C. § 3145(a)(1), "the attorney

4

for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order . . . ."  The district judge conducts a de novo review of the Magistrate Judge's order, by "mak[ing] its own independent determination whether the magistrate's findings are correct, with no deference." United States v. Koenig, 912 F.2d 1190, 1193 (9th Cir. 1990).

18 U.S.C. § 3143(a) prescribes: "the judicial officer shall order that a [defendant] who has been found guilty of an offense and who is awaiting imposition or execution of sentence . . . be detained, unless the judicial officer finds by clear and convincing evidence that the [defendant] is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c)."  The clear and convincing standard requires the party with the burden of proof to provide "the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'" Colorado v. New Mexico, 467 U.S. 310, 316 (1984) (citing 2 McCormick On Evid. § 340 (7th ed.) (last updated 2016)); see also United States v. Jordan, 256 F.3d 922, 930 (9th Cir. 2001) ("stating that clear and convincing evidence 'indicat[es] that the thing to be proved is highly probable or reasonably certain.'") (citing Black's Law Dictionary (7th ed. 1999)). "[P]ending sentencing[, t]he burden of establishing that the defendant will not flee or pose a danger to any other person or to the community rests with the defendant."  Fed. R. Crim. P. 46(c).  Unlike pretrial release, a defendant who has been found guilty by a jury and is awaiting sentencing is no

5

longer entitled to the presumption of innocence; hence, "there is no automatic right to bail after convictions." <u>Harris v. United States</u>, 404 U.S. 1232, 1232 (1971) (citations omitted).

Pretrial Services recommends that Defendant remains in custody, stating in the Pretrial Services Report, dated February 28, 2018 ("PTS Report"):

> The defendant may pose a risk of nonappearance . . . . [Defendant] has family in Armenia; [and] she has a history of travel . . . .
>
> . . . .
>
> . . . Pretrial Services is concerned as the defendant is pending sentencing, she may have access to large amounts of money; Pretrial Services may not have a comprehensive or complete understanding of the defendant's accounts and assets; and the information contained in the Government's Motion [is of concern to Pretrial Services.]
>
> . . . Given all of the . . . noted information [in the Pretrial Services Report], Pretrial Services does not believe there is a condition or a combination of conditions which could reasonably mitigate risk of non-appearance in this case. Therefore, it is respectfully recommended, Your Honor order the defendant remain detained pending further proceedings.

PTS Report, Mem. Feb. 28, 2018 ("PTS Report"), at 6.

The Government argues that the Magistrate Judge's release order should be reversed, contending: "When determining whether the defendant will appear at sentencing as ordered, the Court must necessarily determine whether it can trust the defendant's promise to appear[, and here, t]he Court cannot rely on the defendant's representations that she will appear for sentencing because her actions of defying oaths, tampering with witnesses, and obstructing justice including through perjured

testimony and a perjured defense at trial, show she has no respect for the integrity of the Court's proceedings." Gov't Mem. 9:4-8. The Government argues that Defendant's long history of lying to federal agents and of manipulating others to lie for her, "are highly probative of whether this Court should now trust her to not flee and to conform herself to the Court's orders [which] heavily favor[] the defendant's detention." Gov't Mem. 12:5-9. The Government further argues: "the defendant . . . is an untrustworthy and deceptive individual who has actively endeavored to undermine the integrity of the legal system and this Court." Gov't Mem. 12:15-16. The Government supports its position with the following arguments, which is supported by the record:

> As the evidence at trial showed, the defendant lied under oath as [Vanik] Movsesyan's translator on two occasions, she orchestrated the obstruction of [the United States Citizenship and Immigration Services ("USCIS")]'s investigation by encouraging her husband and others to lie to [federal] officers, and she disregarded [the] oath[] she swore upon entering her [employment] position[] with the SSA by knowingly creating false SSA records and documents on multiple occasions.[] The defendant was not simply obeying her husband, as she argued to [the] Magistrate Judge . . . , but was directing the criminal actions of her husband and others. (Exhibit 3 at 78.)

> Not only was she an active, willing, and controlling participant in the conspiracy, but her conduct cuts to the very core of her reliability and trustworthiness. The defendant knowingly made numerous false statements under oath during Movsesyan's citizenship interviews and she produced . . . false documents on his behalf. The defendant made false SSA documents and records by exploiting the trust she was given as a public employee and in violation of [the] oath[] she swore to well and faithfully

7

discharge her duties. She also had [Razmik] Bagdasaryan sign a false statement under oath [that Movsesyan lived at Bagdasaryan's address], without regard to the fact she was subjecting him to potential criminal liability. (Exhibit 1.) The nature and circumstances of the defendant's conduct shows that she has no regard for the oaths she swears or that others swear, and that she will knowingly make false statements even under oath.

The defendant's conduct also indicates she holds no regard for the sanctity of testimony offered under oath. As Bagdasaryan's statements indicate, the defendant called Bagdasaryan on multiple occasions and told Bagdasaryan to lie to a federal grand jury, heedless that she was again subjecting him to [potential] criminal liability for perjury. (Exhibits 4, 5.) When confronted with this attempted witness tampering at trial, however, the defendant stated she did not make such attempts and tried to explain away phone records corroborating her witness tampering by claiming that she merely called Bagdasaryan around 11:00 p.m. to offer him some food. (Exhibit 2 at 98) . . . .

In fact, the defendant's complete disregard for the sanctity of sworn testimony is underscored by her many perjurious statements made in the presence of this Court. The defendant testified for most of a day (see Exhibit 3), and the jury plainly did not credit her combative testimony on cross-examination, discredited her allegations that her confession was coerced by law enforcement through pressure and threats during her interview, and did not believe her varied excuses for her own conduct. In addition to the jury's conclusion that the defendant did not tell the truth on the stand, the defendant was caught in several lies during her testimony, and those lies are relevant to whether this Court should believe her when she says she will appear for sentencing.

The defendant's lies included the following . . . . [W]hen confronted with the audio recording of her phone call with Razmik Bagdasaryan during his interview with USCIS investigators where she tried to have him lie, the defendant offered a perjured

explanation for her conduct. She claimed on the stand that there had been a prior phone call at the outset of the interview where Bagdasaryan told her he was having trouble understanding the investigators, and that in the later call she was simply trying to assist him in telling the truth. (See Exhibit 3 at 15-17, 20.) But on cross-examination, the defendant . . . admit[ted], in the face of phone records, that the purported first phone call never happened. (Id. at 81-82.) Undeterred, on re-direct examination, the defendant again claimed that the first phone call existed. (Id. at 115-116.) But again on re-cross, she . . . admit[ted] that the . . . phone call never happened. (Id. at 123.)

[Further], the defendant testified that during her recorded phone call with Bagdasaryan during the USCIS interview, there was confusion during the beginning of the interview because of the presence of a Russian language interpreter. (See Exhibit 3 at 19-20.) She testified that she was trying to assist Bagdasaryan through that issue, not trying to direct him to lie. But, . . . when confronted with evidence, the defendant . . . admit[ted] that there was no mention of a Russian interpreter until much later in the interview. (See id. at 87-88.)

[Part of Defendant's] defense at trial was that rather than make a material false statement on a key Social Security letter used in Movsesyan's immigration proceedings, the defendant simply made a "typo." (See, e.g., Exhibit 3 at 12.) She . . . testified [about] this on the stand . . . . [Defendant lied o]n the stand . . . that she create[d] the typo because Movsesyan was on the phone with her while she was creating the letter, and he distracted her. But when confronted with phone records, the defendant . . . admit[ted] that she was not on the phone with Movsesyan at the time and that she had time to review Movsesyan's records before entering the information onto the letter. (Id. at 62-63.)

Gov't Mem. 9:26-12:2 (footnote omitted). The Government raises as an alternative argument, which further supports its contention of Defendant's untrustworthiness, regarding the concern of

unverified equity in the property securing the proposed $1.5 million bond:

> [T]he lack of . . . specific information about the properties that would secure a proposed bond package call[s] its effectiveness into doubt and the Court should therefore [conduct] an inquiry into the property designated as collateral. On the government's motion, "the court shall conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use of collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(g)(4).
>
> The government has no information about the properties that the defendant proposes should secure her release. Only on the day of her hearing did the defendant identify the addresses of some proposed properties. The only evidence of their value has been an "estimate" of the equity in two properties presented in her brother's affidavit attached to her motion. ECF No. 194-1 at 4. Indeed, even the owner of the second property did not submit a declaration about his property or its value. The government and Court have no facts related to the source and value of the proposed properties, and at this point the Court cannot determine whether the proposed properties are sufficient to reasonably assure the defendant's appearance.

Gov't Mem. 24:5-19.

Defendant objects to the Government's argument that Defendant is untrustworthy, arguing:

> The Government argues that . . . Mrs. Kesoyan's level of untrustworthiness is so egregious that no conditions of release are sufficient. This position is based largely on the facts adduced at trial relating to . . . Mrs. Kesoyan's role in the overall conspiracy and in the creation of the false government document. Whether based on her decision to present her defense at trial or on some other perception as to the Defendant, the Government's positon fails to account for the

10

fact that the pretrial and post-conviction release of her codefendants, both identically situated, apparently did not raise similar concerns on the part of the government regarding flight and danger. The Government's argument, taken to its logical conclusion, assumes that any defendant convicted of a crime involving fraud, deceit, or dishonesty could never be released pursuant to §3143. Such a conclusion is patently inconsistent with the law and practical experience.

Def. Opp'n 11:7-18. Defendant contends she is not a flight risk due to "her critical ties to the community and [to] her family [and t]he substantial property bond," stating:

Mrs. Kesoyan is active in her church and has the support of her community. However, her unique family ties are what most saliently demonstrate that she is not a flight risk. Mrs. Kesoyan has a 22 year old son, Haik, who has cerebral palsy and developmental disabilities. She is his main caregiver, helping him daily with basic self-care, meal preparation, and transportation. TX 10:18-25. She is also the designated caregiver through Sacramento County In Home Supportive Services (IHSS), for her mother-in-law, Lusik, who suffers from dementia and kidney disease. Mrs. Kesoyan has been a principle caregiver for Lusik for the past five years, and prior to that was a caregiver to Lusik's husband (Mrs. Kesoyan's father-in-law), who is now deceased. DKT #194; TX 11:1-5. The fact that Mrs. Kesoyan's close family members, including her own disabled son, rely on her for essential care and assistance powerfully demonstrates her strong ties to the community and the decidedly low risk of flight in this case. There is simply no reason to believe Mrs. Kesoyan would ever risk her own family's physical wellbeing and deprive them of the places where they have received care by failing to appear for her sentencing in this matter, especially after a record of fully complying with the terms of her pretrial release for the entire duration of this case. TX 11:11-22.

. . . .

. . . The Defendant has an almost 18 year history as a well-regarded employee and

was the regular recipient of awards for exceptional service. She is part of a closely knit community of political refugees who fled Communism, an active member of her church, and sufficiently involved in her church community to warrant her pastor attending trial and appearing at the bail hearing to support her release. She has surrendered her passport and appeared as required throughout the case.

. . . It is simply not reasonable to believe that a mother would abandon her own profoundly disabled son, who cannot care for himself, whom she has raised and taken care of for 22 years. As a devoted daughter and daughter-in-law, Mrs. Kesoyan would most certainly not abandon her mother, who suffers heart health problems, or her mother-in-law who is suffering from significant dementia. She has two other children in Sacramento whom she would also not abandon. A person with such a clearly demonstrated connection with her family would not jeopardize their care or physical well-being to avoid the consequences of this case. It strains credulity to believe that she would flee and deprive her family members of a place to live and forfeit her brother's home and the home in which her mother lives.

The substantial bond secured by her family's homes is more than sufficient to ensure the Defendant's appearance for sentencing in this case. There is simply nothing new or persuasive in the arguments presented by the Government in its motion to revoke [the Magistrate] Judge['s] Order issued only after a thorough hearing, and the motion should be denied.

Def. Opp'n 7:25-8:14, 13:5-27, 14:2-3.

The Government disagrees with Defendant's position on the flight risk issue and further supports its position arguing that Defendant, if released, has access to financial assets to flee prior to sentencing, as evinced by the "hidden, undisclosed assets" that she lied about when she communicated with Pretrial Services, Gov't Mem. 17:13-18, and would not hesitate to flee, as

evinced by the manner in which she has subjected her family and friends to potential criminal liability, Gov't Mem. 17:28–18:6. The Government argues:

> During [Defendant's] interview with her pre-trial [services] officer, the defendant reported that she had no assets in bank accounts. Evidence from recorded phone calls[, occurring while Defendant was detained post-convictions], however, indicates that the defendant has other substantial assets: a secret savings account that contained $12,000, until the funds were withdrawn and hidden; the defendant's 401(k) account; and the tens of thousands of dollars that the defendant has received through an online GoFundMe campaign and from cash donations. The fact that the defendant has access to hidden, undisclosed assets should weigh heavily in the Court's consideration.
>
> Before [the] Magistrate Judge . . . , the defendant argued she was merely trying to hide money from her husband. However, as the defendant noted [in] the January 31, 2018, call, "No-one knows about" the savings account in her son's name, which meant it was <u>already</u> hidden from her husband. This proffered excuse also does not ameliorate the concern raised by the additional undisclosed assets to which the defendant has access. Rather, the logical and reasonable inference from the facts presented is that the defendant is hiding money either to conceal it from a possible fine, as she expressly discussed with her 401(k) account, or to conceal assets that she can use to facilitate her flight should she be released. It is the defendant's burden to clearly and convincingly negate the reasonable inferences that can be drawn from these facts, and she failed to do that.

Gov't Mem. 17:13–27 (emphasis in original). The Government supports its position, citing the following post-conviction recorded jail telephone conversations and observations:

> [I]n a February 6, 2018, phone call [Defendant had] with her daughter, Lia [or Leah], they discuss money in one of the defendant's accounts, [which] shows that the

13

defendant and her daughter are considering
how to hide the assets should the Court order
a fine:

> Leah: [Loud voices in the background]
> Your 401 account.
>
> NK: Yeah!
>
> Leah: Uh . . . It . . . did they touch
> it?
>
> NK: No, that stays! There is no end to
> that.
>
> Leah: [OV] I understand
>
> NK: [OV] That's my money.
>
> Leah: Okay.
>
> NK: They can't do anything to it. No
> way! I also had thought about that a few
> days ago.
>
> Leah: Because, you had a thing . . .
> something like, the judge had said
> that . . . you have a $250,000
> fine . . . That should be . . . uh . . .
> the thing . . . uh . . . they will say
> if it's for sure or not at the
> sentencing. Something like that . . .
> There were [UI], that's why I was
> thinking, "Should I take it out of
> there . . . ?" That's why . . . . I
> don't know . . .
>
> NK: Um . . . I don't know.
>
> Leah: Listen! Those rats . . . that
> prosecutor . . . [.]

(Id. at 3.)

Similarly, during a January 31, 2018,
call with "Davo," [who is believed to be the
husband of Defendant's daughter, Lia,] the
defendant directs Davo to move money out of a
secret bank account — which the defendant
maintains under her disabled son's name — and
hide it:

> NK: [00:03:23]
>
> No-one knows about this. I am telling

14

you to tell Leah. She knows my
password . . . uh . . . for Wells Fargo.
Let her log in . . . "Armenia2016"
"123leo". Let log in . . . Dav [PH],
there is money in Savings. No-one knows
about this.

Davo: [OV] Yeah.

NK: Take out the money from the Savings
and hide it. It's under Hayk's [PH]
name.

Davo: [OV] Yes, dear Nell [PH]. No
problem.

NK: [OV] Go to Wells Fargo with Hayk,
take out that money and hide it. Did you
hear me?

Davo: Yes, for sure! I will do that.

NK: [OV] Okay. Hide that and I will tell
you what to do. Also, Dav [PH], Hayk's
[PH] pension/disability goes into his
checking.

Davo: [OV] Yes dear.

(Exhibit 16 at 2.) Later in the same call,
the defendant tells Davo to take all of the
gold jewelry out of the house and keep it in
the bank's safe. (Id. at 4.) Later, she again
directs Davo to hide her money:

NK: [00:12:02]

You remember, right? Write "Armenia2016"
"123leo".

Davo: For sure!

NK: Let her go into the account and take
care of everything. Let her go in
everyday . . . to the Savings . . .
Tomorrow, take Hayko [PH] and from the
Savings . . . there is $12,000 and
couple of hundreds there. Take out that
money . . .

Davo: [OV] Yeah.

NK: And hide it. Take and hide it
somewhere, or give it to my mother. So
that they don't see that money, because

15

> I have saved that money penny by penny. [Pause]
>
> Davo: For sure dear Nell [PH].

(Id.) Finally, it appears that Lia comes onto the line and the defendant again directs her to hide the money, which is held in her son's name and that nobody knows about: "Leah (sic), in the morning go and take that money from Hayko's [PH] account . . . from the Savings . . . and hide it. No-one should know about that." (Id. at 5.)

> . . . [T]he defendant has furthered her efforts to conceal assets during the pending bail review litigation. For instance, on February 10, 2018, the defendant had a conversation with her daughter (summarized below) about obscuring transferred assets about which pre-trial officers had questions:
>
> > Kesoyan talks about the paperwork the authorities have that indicate her assets. She says she was questioned about a money transfer that she did not do. Kesoyan states that the money they're talking about is the one that's in the savings account that belongs to Lia. She says her daughter to make sure to tell them, if ever asked, that it was not Kesoyan's money. Kesoyan asks if that money is still in Lia's savings account. Lia confirms.
> >
> > Kesoyan says: "Yes, then that's your money. And you have transferred that money to take care of the lawyer's fees anyway.
>
> (Exhibit 17 at 2.)

Gov't Mem. 14:21-22, 15:5-17:12 (alterations in original) (emphasis in original) (footnote omitted). The Government argues that Defendant's access to assets evinces that she is a flight risk and that she is a person who cannot be trusted because of

> [D]efendant['s] consistent[] use[ of] her family to facilitate her criminal activities, to help her manipulate the Court, and to assist her in hiding assets, without regard to the fact that this conduct puts her family

16

> in [potential] jeopardy of their own criminal charges. Because the defendant puts her own interests before those of her family, there is no reason the Court should believe that she will not flee merely because of her family ties. The defendant has not shown by clear and convincing evidence that she would not flee, either taking some of her family with her or leaving them behind to be cared for by the rest of her family and the community, as is currently happening.

Gov't Mem. 17:28–18:6.

Defendant counters the Government's argument regarding hidden assets, arguing "the asset transfers were to prevent misuse of those funds by the defendant's husband to support his drug addiction and were disclosed and explained by the defendant to the Pretrial Services Officer. TX 5:1-20." Def. Opp'n 9:6-8. Defendant argues:

> The [assertions] that Mrs. Kesoyan will try to hide assets, flee the jurisdiction or attempt to further influence potential witnesses . . . were rejected by the Magistrate Judge no doubt because the prosecution's interpretation of certain facts, while perhaps plausible hypothetically, do not approach a level of certainty necessary to overcome the clear and convincing evidence that . . . Mrs. Kesoyan's appearance can be secured by a $1.5 million secured bond and strict conditions of release. Those conversations are inherently subject to dispute. For example, the Government offers a conversation recorded on February 9, 2018, during which Mrs. Kesoyan discussed a potential witness who left the country prior to trial, and claims it shows "the defendant and her family are staying engaged in tampering with any possible investigation" of the witness. DKT #201 at 18:20-23. The call transcript excerpts show exactly the opposite of the government's contention. The transcript shows the Defendant saying that the situation is "interesting" and her husband responding to "Forget about it." The Defendant agrees, "What do I care?" DKT #201 at 18:1-18.

> Regarding the hiding of assets, [the Magistrate] Judge . . . found that "those conversations are certainly subject to a lot of interpretations. [The Government's] is plausible . . . but actually seems to be equally plausible reading of the statement that the concern was to make sure that the $250,000 for a fine was saved from the husband's stealing for drug money, right, along with taking care of the son's needs and so forth." TX 32:10-16. Despite the prosecutors' attempts to undercut this finding, a Court need not disregard all other plausible, reasonable interpretations of the conversation merely because the Government argues to the contrary. Moreover, the Government has failed to cite any authority for the proposition that Mrs. Kesoyan's stated interpretation of her own recorded jail calls are insufficient, when considered with the entirety of the record or that Defendant is not entitled to the benefit of the doubt if there is ambiguity. DKT #201 at fn 5. Finally, the Government's position that the proffer of equity in property as bail security is insufficient simply ignores the manner in which bond orders are fashioned and accepted in this District, as already noted at the bail hearing.

Def. Opp'n 11:19-12:21 (footnote omitted).

The Government is correct in its assertion that "[w]hen determining whether the defendant will appear at sentencing as ordered, the Court must necessarily determine whether it can trust the defendant's promise to appear." Gov't Mem. 9:4-5. The Defendant's demeanor when she testified at trial, at times, evinced her utter disregard for the truth. As the Government states, the trial record shows

> agents of the FBI and IRS Criminal Investigations [saw Defendant with Movsesyan in front of a federal building in Sacramento as they] were surveilling Movsesyan in the course of [an] investigation [of credit card fraud of Movsesyan], and [became] aware of [Movsesyan's] movements between Burbank, where Movsesyan lived, and Sacramento. These agents also learned that Movsesyan had worked

18

with the defendant to submit false documents during his immigration proceedings[, and] the government then began to investigate those false documents, which implicated Movsesyan, the defendant, and her husband, Grigor Kesoyan, in attempts to deceive immigration officials, falsify government records, and tamper with grand jury witnesses.

. . . [I]n January 2014, Movsesyan submitted a naturalization application to the Sacramento office of the Department of Homeland Security, U.S. Citizenship and Immigration Service ("USCIS"). That application listed his address as being in Sacramento, California. [Movsesyan] included with his application an official Social Security letter, prepared by the defendant, that [falsely] contained a[n] address in Sacramento[, at which Movsesyan did not reside]. The defendant served as Movsesyan's sworn interpreter at his naturalization interview, during which Movsesyan falsely affirmed under oath that he lived at the Sacramento address. The January 2014 application was ultimately denied because Movsesyan had a disqualifying criminal conviction within the applicable timeframe.

Movsesyan applied for naturalization again in May 2014. He again listed the Sacramento address in his application, and included with his application another official Social Security letter, prepared by the defendant, that [falsely] contained a[n] address in Sacramento[, at which Movsesyan did not reside]. The defendant again served as Movsesyan's sworn interpreter during the interview, during which he again falsely affirmed under oath that he lived in Sacramento. The same USCIS officer conducted this second interview, and again told Movsesyan that he would have to substantiate that he lived in Sacramento. Following the interview, the defendant was observed taking Movsesyan and his immigration attorney to the Hyatt Regency hotel and then to the Sacramento airport, where they boarded a flight to Burbank, California.

Movsesyan submitted a number of fraudulent documents to USCIS purporting to show that he resided at the Sacramento address. USCIS's Fraud Detection and National Security unit subsequently

19

investigated the documents and determined they were false. Movsesyan's second naturalization application was ultimately denied because Movsesyan had given false testimony to obtain an immigration benefit.

One document submitted to USCIS was an affidavit signed by Razmik Bagdasaryan, the individual who resided at the Sacramento address claimed by Movsesyan. (Exhibit 1.) Bagdasaryan is the defendant's brother-in-law. On November 17, 2018, Bagdasaryan was interviewed by USCIS officers. This interview was recorded, and excerpts of the interview were admitted at trial. (Exhibit 2.) At the beginning of the interview, Bagdasaryan, who does not speak much English, called the defendant to have her translate between him and the USCIS officers. The recording captured the defendant telling Bagdasaryan in Armenian that the officers were there to ask about a man named "Vacho." She told Bagdasaryan to tell the officers that Vacho lived at the house, but she also told Bagdasaryan to say that he did not remember the specific dates and not to provide more than "yes" or "no" answers. She told Bagdasaryan that she was coming over. Instead of coming herself, however, the defendant sent her husband, Grigor, and Bagdasaryan's daughter because Bagdasaryan was not saying what he was "supposed" to say. (Exhibit 3 at 87.)

When Bagdasaryan's daughter, Hasmik Bagdasaryan, arrived she made her own false statements about whether Movsesyan lived at the home. Toward the end of the interview, the defendant's husband, Grigor Kesoyan, arrived and attempted to interfere with the interview. The USCIS officers visiting the home noted the discrepancies in the three statements about when Movsesyan lived at the house, how they knew Movsesyan, and where Movsesyan was at that moment. The USCIS officer also observed that the room where Movsesyan supposedly lived contained only women's and children's items.

While not introduced at trial because he had flown to Armenia, Bagdasaryan was later interviewed by federal law enforcement agents and admitted that he signed the affidavit containing Movsesyan's address. (Exhibit 4.) He told the agents that he did so at the

defendant's request. Further, [Bagdasaryan told federal agents that] the document was in English, which Bagdasaryan cannot read, and [that] the defendant [told him just to sign the letter and she would explain to him everything afterward. (Id.) A]fter Bagdasaryan signed the document[, Defendant told him] that it was to let "Vacho" use Bagdasaryan's address. Bagdasaryan again confirmed that Movsesyan did not live at the address. He also told law enforcement agents that after they learned he had been subpoenaed to testify before a federal grand jury, the defendant and Grigor Kesoyan made a number of visits and phone calls in an attempt to influence his testimony before the grand jury. They told Bagdasaryan to tell the grand jury that Movsesyan lived at the address. [(Id.)] When he appeared before the grand jury, however, Bagdasaryan [testified: "She[, Nelli] told me to come and tell [the grand jury] the story a certain way, but I came and I told you the real way." (Exhibit 5 at 10:19-20; see also] at 8-11.)

At trial, the government showed that Movsesyan also submitted to USCIS a letter on Social Security Administration ("SSA") letterhead that [states], "ACCORDING TO SSA RECORDS VANIK MOVSISYAN RESIDES IN SACRAMENTO . . . SINCE 08/2009." A subsequent SSA Office of the Inspector General investigation determined that the defendant, who was then employed by SSA, created this letter and that she also altered SSA records to indicate that Movsesyan lived in Sacramento. Though the defendant [falsely testified] at trial that the letter was merely a "typo," it contained the same false information included in Movsesyan's citizenship application and the affidavit the defendant had Bagdasaryan sign under oath. In convicting the defendant, the jury necessarily found she testified falsely at trial about the letter merely being a "typo."

Eventually, the defendant was interviewed by law enforcement agents. (Exhibit 6.) During the interview, she admitted that she created the letter and that she knew Movsesyan never lived at the Sacramento address. She told law enforcement agents that she typed the information stating SSA records showed Movsesyan lived in Sacramento since 2009. She said knew

> Movsesyan did not live in Sacramento and she was just "being stupid" when she created the letter. [(Id.)] The defendant was also asked about the [notarized letter] signed by Bagdasaryan [attesting that Movsesyan lived at Bagdasaryan's address (Id. at 3)]. She stated that Bagdasaryan cannot read English and that [therefore, he could not read the letter. (Id.)].

> At trial, the defendant [falsely testified] that she only made these admissions because the law enforcement agents yelled at her and threatened her and her family. [(Exhibit 3 at 109:23-11:9.)] In convicting the defendant, the jury necessarily found she testified falsely in denying her confession.

Gov't Mem, 4:27-7:20.

Further, Defendant's manifested dishonesty in the record, combined with her access to hidden assets[1] and her ties outside the United States evince that she cannot be trusted when she represents to the Court that she will not flee, if released. See United States v. Cerizo, 542 Fed.Appx. 641, 642 (9th Cir. 2013) (stating Defendant's "long history of dishonesty and ties outside . . . the United States provided an ample basis for denying his bail request.").

---

[1] In addition to Pretrial Services concern about Defendant's hidden assets, PTS Report, at 6, and the Government's evidentiary support for the hidden assets, Gov't Mem. 14:21-22, 15:5-17:27, Defendant's argument that she was hiding assets from her husband so that he did not use the funds for his drug addiction, see Def. Opp'n 9:6-8, does not comport with her explicit direction in the recorded phone conversation to "[t]ake and hide it somewhere, or give it to my mother[, s]o that they don't see that money." Gov't Mem. 16:23-25 (emphasis added)(citation omitted). Even if the inconsistency between her grammar and intent was inadvertent and if Defendant is genuinely hiding assets from her husband, the fact remains that these assets are at Defendant's disposal and support Pretrial Services' concern that "defendant may have access to large amounts of money [and] Pretrial Services may not have a comprehensive or complete understanding of the defendant's accounts and assets." PTS Report at 6. Defendant's access to financial means, collectively with her willingness to jeopardize family and friends' well-being by having them help her hide money from federal officials and with her evidenced untrustworthy conduct, demonstrate a high probability that Defendant is likely to flee, if released.

Therefore, the Government's motion is granted and the Magistrate Judge's ruling releasing Defendant on secured bond pending sentence is revoked.

Dated:   March 8, 2018

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge